UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| KOSS CORPORATION,<br><br>        Plaintiff,<br><br>        v.<br><br>APPLE INC.,<br><br>        Defendant. | Case No. 6:20-cv-00665<br><br>**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Koss Corporation ("Koss" or "Plaintiff") files this complaint for patent infringement against Apple Inc. ("Apple" or "Defendant") alleging, based on its own knowledge as to itself and its own actions, and based on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This is a civil action arising under the patent laws of the United States, 35 U.S.C. § 1 et seq., including specifically 35 U.S.C. § 271, based on Apple's willful infringement of U.S. Patent Nos. 10,206,025 ("the '025 Patent"), 10,298,451 ("the '451 Patent"), 10,469,934 ("the '934 Patent"), 10,491,982 ("the '982 Patent"), and 10,506,325 ("the '325 Patent") (collectively "the Patents-in-Suit").

503314262 v9

## THE PARTIES

2.      Plaintiff Koss Corporation is a corporation existing under the laws of the State of Delaware having its principal place of business located at 4129 North Port Washington Avenue, Milwaukee, Wisconsin 53212.

3.      Koss markets a complete line of high-fidelity headphones and audio accessories. Koss's products, branded under the Koss brand name or private label brands, are sold at various retail chains throughout the United States and the world, including Walmart stores and other large brick-and-mortar establishments, as well as direct to customers in at least the following cities in this District:  Alpine, Austin, Del Rio, El Paso, Midland, Odessa, San Antonio, and Waco.

4.      Koss also serves as an Original Equipment Manufacturer ("OEM") for a customer in this Judicial District. In this role, Koss manufactures OEM headphones sold under its customer's brand.

5.      On information and belief, Apple is a California corporation having a principal place of business located at One Apple Park Way Cupertino, California 95014 and regular and established places of business at 12535 Riata Vista Circle, Austin, Texas and 5501 West Parmer Lane, Austin, Texas.

6.      On information and belief, Apple is in the process of building a 15,000-employee, 3-million square foot campus in Austin, Texas.

7.      Apple employs thousands of people, including at least hundreds of engineers, who currently work, and will in the future work, at either the Riata Vista Circle location, the West Parmer Lane location, or the new 15,000-employee campus location, in Austin, Texas.

503314262 v9

8.      On information and belief, Apple presently employs personnel with responsibility for Apple's wearable products, including the Apple AirPods and/or the Apple Beats by Dre product line, in Austin, Texas.

9.      On information and belief, Apple employs a senior manager in charge of Demand Management for wearables in the United States, including the Apple AirPods and Apple Beats by Dre products, in Austin, Texas.

10.      On information and belief, Apple presently employs personnel with responsibility for online content management related to Apple's wearable products as well as Apple's HomePod product in Austin, Texas.

11.      On information and belief, Apple employs an online content manager with responsibility for iPhone, iPad, Apple Watch, HomePod, AirPods, and Apple Beats by Dre in Austin, Texas.

12.      On information and belief, Apple employs a software performance engineer in Austin, Texas responsible for activating every iPhone, iPad, Apple Watch, and HomePod worldwide.

13.      On information and belief, Apple employs a Specialty Programs Manager in Austin, Texas with responsibility for the Apple Watch Series 3 and the HomePod, among other programs.

14.      On information and belief, Apple operates brick-and-mortar retail establishments ("Apple Stores") at Barton Creek Square, Austin, Texas and at Apple Domain Northside, Austin, Texas.

15.     Each of these Apple Store locations offers for sale and sells Apple wearable products (including Apple AirPods and Apple Beats by Dre products), Apple Watch products, Apple iPhone products, and Apple HomePod products.

16.     On information and belief, the Best Buy store at 4627 S. Jack Kultgen Expy., Waco, TX 76706 also sells Apple wearable products (including Apple AirPods and Apple Beats by Dre products), Apple Watch products, Apple iPhone products, and Apple HomePod products.

17.     Apple is registered to do business in the state of Texas and lists CT Corp. System, located at 1999 Bryan St., Suite 900, Dallas, TX 75201 as its registered agent in the State of Texas.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the claims herein arise under the patent laws of the United States, 35 U.S.C. § 1 et seq., including 35 U.S.C. § 271.

19.     This Court has personal jurisdiction over Apple in this action because Apple has committed acts of infringement within the State of Texas and within this District through, for example, the sale of Apple AirPods, Apple Beats by Dre products, Apple Watches, Apple iPhones, and Apple HomePods both online and from Apple Stores in this District.  Apple regularly transacts business in the State of Texas and within this District.  Apple engages in other persistent courses of conduct and derives substantial revenue from products and/or services provided in this District and in Texas, and has purposefully established substantial, systematic, and continuous contacts within this District and should reasonably expect to be sued in a court in this District.  For example, Apple has offices in this District and has a registered agent for service in Texas.

20.     Apple continues to grow its presence in this District, further cementing its ties to this District.  Apple operates a website and various advertising campaigns that solicit sales of the

-4-

infringing products by consumers in this District and in Texas.  Apple has entered into partnerships with numerous resellers and distributors to sell and offer for sale the Accused Products to consumers in this District, both online and in stores, and offers support service to customers in this District.  Given these contacts, the Court's exercise of jurisdiction over Apple will not offend traditional notions of fair play and substantial justice.

21.    Venue in the Western District of Texas is proper pursuant to 28 U.S.C. §§ 1391(b), (c) and l400(b).  Apple has regular and established places of business in this District, including at 12535 Riata Vista Circle and 5501 West Parmer Lane, Austin, Texas.  Apple has committed acts within this judicial district, giving rise to this action.  Apple continues to conduct business in this judicial district, including one or more acts of making, selling, using, importing and/or offering for sale infringing products or providing support service to Apple's customers in this District.

## KOSS'S LEGACY OF AUDIO INNOVATION

22.    Koss was founded in 1953 as a television rental company in Milwaukee, Wisconsin.

23.    In 1958, John C. Koss invented the world's first SP/3 Stereophone as part of a "private listening system" that would enable the wearer to listen to a phonograph without disturbing others in the vicinity:



24.    The SP/3 Stereophone provided, for the first time, a high-quality stereophonic headphone that approximated the sounds of a concert hall.

25.    John C. Koss demonstrated the SP/3 Stereophone at a Wisconsin audio show in 1958.  Initially designed to demonstrate the high-fidelity stereo sound that a portable phonograph player delivered, these revolutionary SP/3 Stereophones became the hit of the show.

26.    The SP/3 Stereophone has since been enshrined in the Smithsonian Museum's collection in Washington, DC, with John C. Koss delivering the SP/3 for enshrinement along with an explanation of the story of the SP/3 in 1972:

503314262 v9



27.     Koss's commitment to headphone development continued into the 1960s and beyond.  In 1962, Koss developed and brought to market the PRO/4 Stereophone, which was bestowed with *Consumer Union* Magazine's #1 choice award in 1963:



28.     Due to the success and quality of the Pro/4, the United States government awarded Koss with a contract to install fifty (50) Pro/4 units in the staff, press, and presidential quarters of Air Force One.  Passengers accessing the aircraft's state-of-the-art entertainment system listened to the system using the Pro/4:

503314262 v9



29.      In 1970, Koss moved its World Headquarters to the current location at 4129 North

Port Washington Ave., Milwaukee, Wisconsin:



30.      Also in 1970, Koss set the standard for full-size professional headphones with its

Pro/4AA:



31.    At the time of introduction, the Pro/4AA were regarded as the first dynamic headphones to deliver true full frequency and high-fidelity performance with noise-isolating capabilities.

32.    Koss continued improving its Stereophone product line throughout the 1970s and into the 1980s.  In 1984, Koss introduced the Porta Pro, an acclaimed product that set performance and comfort standards for on-the-go listening:

503314262 v9



33.     The Porta Pro continues to be one of the most popular headphone products around the world, particularly because of its exceptional audio fidelity and performance capabilities.  In fact, as recently as 2008, CNET awarded the Porta Pros a four-star rating of 8.3 (out of 10), with a performance score of 9 (out of 10), stating that "there's no denying the sound quality here: they're the ideal companion for mobile audiophiles and home theater enthusiasts." (https://www.cnet.com/reviews/koss-portapro-with-case-review/).

34.     In 1965, Koss introduced the award-winning speaker, the Acoustech X, which was heralded as a breakthrough product by Billboard Magazine, touting its concert hall quality and ability to accurately amplify an acoustic guitar to large concert halls.  *Acoustic System Succeeds In Classical Guitar Concert*, BILLBOARD, May 27, 1967, at 71.

35.     Following on Acoustech X, Koss went on to develop a number of additional products:  the world's first computer maximized loudspeaker in 1976; the Kossfire speaker line in

the 1980s; the dynamic audio/video Dynamite bookshelf series speaker line; a line of portable/desktop computer speakers that employed a unique magnetic shield to protect nearby computer video and data equipment; and an amplified portable loudspeaker, the M/100, in early 1987.

36.     In 1987, Koss pioneered one of the earliest completely wireless infrared speaker systems:  the JCK 5000.  In 1986, Koss also unveiled a portable speaker, the KSC/50, which was utilized by thousands of members of the United States military during the Gulf War in 1990. Related to the KSC/50, Koss's KSC/5000 included a built-in amplifier.  Those products were profiled in a Newsweek feature on October 12, 1987:



37. Over the following years, Koss continued to expand its portable speaker offerings, including by expanding into speakerphones for teleconferencing systems with the Speakeasy line, followed by various additional wireless models for portable use.

38. Elite musicians, including Tony Bennett, Les Brown, and Frank Sinatra Jr., have used Koss headphones, including the Pro/4, while recording and/or performing. Koss's official spokespeople have included music legends Mel "the Velvet Fog" Tormé and Doc Severinsen, the trumpet-playing bandleader for Johnny Carson's Tonight Show band.

39. In 1979, John C. Koss was inducted into the Audio Hall of Fame.

40.     In 2000, John C. Koss was inducted into the inaugural class of the Consumer Electronics Hall of Fame.

41.     In 2004, John C. Koss was inducted into the Wisconsin Business Hall of Fame.

## KOSS DEVELOPS THE FIRST EVER TRUE WIRELESS HEADPHONES

42.     Continuing its culture of innovation in high-fidelity audio equipment, in the early 2000s, Koss began developing what became known as the "Striva" project.  The vision for the Striva project was borne out of Koss's recognition that wireless headphones were going to be an integral part of peoples' audio consumption.  In particular, Koss recognized that as radios were needing progressively less power, and as batteries and other power sources became smaller and more efficient, people would eventually consume audio content through headphones wirelessly connected to some kind of a source, be it a handheld computing device or in the cloud.

43.     In the early 2000s, Koss began making substantial monetary investments in the Striva project, with the goal of bringing "True Wireless" listening to its loyal customers as the next in a long series of headphone innovations.

44.     Koss recognized that the future was a wireless world, complete with mobile internet connectivity that went beyond traditional hardwired, or computer-based, network topologies.  It recognized that wireless ubiquity was coming, and would extend to wearable devices, including Koss's area of expertise:  the headphone.

45.     With these recognitions in mind, Koss made a substantial commitment to investing in what it saw as the future of headphone technology.  This work eventually became the Striva project, and over the course of its work, Koss invested tens of millions of dollars developing chips, fabrication techniques, prototype headphones, and other related technology to bring the Striva vision to life.

46.     In particular, Koss's work on Striva resulted in the development of a system-on-chip smaller than a human fingertip that could provide audio and wireless communications processing on a low power budget for incorporation into headphones of various form factors:



47.     Koss's work to develop Striva also predicted some of the interactions that modern headphone users take for granted today.  In particular, Koss recognized early on that the inclusion of a microphone (with appropriate voice recognition software and circuitry) could provide a convenient, hands-free way to interact with wireless headphones.  Koss developed technology that could react to such voice prompts, and in fact implemented prototypes that reacted to users saying "Striva" into a headphone-mounted microphone to begin a voice-based interaction to, for example, switch tracks or adjust headphone volume.

48.     Koss also recognized a headphone concept that users today take for granted: different headphones for different applications.  In particular, as part of the Striva project, Koss developed different form factors with different performance capabilities depending on anticipated use.  Over-ear headphones provided users with higher-quality sound, ambient noise dampening capabilities, and better battery life (due to additional battery real estate), while in-ear headphones provided portability and capability in a smaller, less-intrusive package.

49.     Koss developed prototype in-ear headphones that relied on its chip development efforts, with working prototypes from the mid-2000s looking very much like commonly-known consumer products that flood the market a decade-and-a-half later:



50.     In 2012, Koss introduced Wi-Fi enabled headphones, the result of its Striva project, which BizTimes hailed as the first wireless headphones to use Wi-Fi transmission and credited Koss with "introducing personal listening to the Internet."   (https://biztimes.com/koss-creates-wireless-headphones-for-wi-fi-music-access/).

51.     In April 2012, Koss brought to market both an in-ear and over-ear embodiment of the Striva vision, with the Striva Pro model being the first true Wi-Fi over the ear headphones (and mirroring many features and aesthetics modern-day users expect in wireless, over-ear headphones):



52.     The Striva Tap, a smaller, in-ear version of the Striva Pro Wi-Fi headphone, provided users with some of the features that modern-day consumers take for granted in in-ear headphones, like independent wireless earphones with touch gestures to control listening preferences by manipulating the surface of the headphones:



53.     Koss also developed (though ultimately did not market) a smart speaker that incorporated many of the Striva features, albeit in a non-wearable form factor.  The Striva-based

speaker product had a capacitive touch interface to mimic the features of the Striva headphones, and also included a microphone for voice control.  In addition, the Striva-based speaker had the capability to be included in a distributed network as part of a precursor to the presently-understood Internet of Things, such that the input devices (e.g., the microphone) could be used to control other items in the distributed network (e.g., light switches).  The speaker therefore allowed, for example, a user to say "Striva, turn on the lights," and the lights would turn on.

54.     The Striva-based speaker product, referred to as the LS2, exists as a working prototype:



55.     Unfortunately, the economic reality of Koss's market position did not permit it to bring its Striva-based product vision to the masses.  In particular, due to events abroad (and Koss's reliance on sales into those foreign countries), Koss's supply chain and customer base were thrown into upheaval in the late-2000's and early-2010's.

56.     Moreover, Koss conducted market research during the mid-2000's, and concluded that given the market that was likely to develop for wireless headphones, larger companies with more manufacturing capability would become a substantial threat to bringing Striva fully to

market.  As a result, Koss invested substantially on part-purchasing, machinery, fabrication, and the like.

57.     The circumstances above, and other circumstances outside of Koss's control, meant that the advanced features first developed for Striva were not able to be fully experienced by the majority of the purchasing public.

58.     Koss brings the instant lawsuit because the industry has caught up to Koss's early-2000s vision:  the technology Koss developed as part of its substantial Striva investment has become standardized, with whole listening ecosystems having been built around the techniques Koss conceived of over a decade ago.

59.     More fundamentally, Koss is responsible for creating an entire headphone industry beginning from its release of the pioneering Stereophone as a ubiquitous way to consume information in 1958.  Apple and others are reaping enormous benefits due to John C. Koss's vision, and Koss Corporation's commitment to that vision, for more than six decades.

## APPLE'S LATE FORAY INTO THE WIRELESS HEADPHONE SPACE

60.     In 2014, Apple announced its multi-billion dollar acquisition of Beats Music and Beats Electronics, a headphone and speaker company formed in 2008.  Beats' first wireless headphone, Beats by Dr. Dre Wireless, was released in late 2012.

61.     On September 7, 2016, amid much fanfare and nearly four (4) years after Striva hit the market and two years after Apple's purchase of Beats, Apple released the Apple AirPods. Apple touted the AirPods as its "new wireless headphones that use advanced technology to reinvent how we listen to music, make phone calls, enjoy TV shows and movies, play games and interact with Siri, providing a wireless audio experience [it claims was] not possible before." (https://www.apple.com/newsroom/2016/09/apple-reinvents-the-wireless-headphones-with-

airpods/).  The AirPods "automatically connect[] to all your Apple devices simply and seamlessly, and let[] you access Siri with just a double tap" and allow a user to "seamlessly switch from a call on [an] iPhone to listening to music on [an] Apple Watch." (*Id.*).  The AirPods also permit a user to use a vocal trigger ("Hey, Siri") to alter the listening experience, much like the technology Koss pioneered with Striva in the mid-2000's.

62.     Also on September 7, 2016, Apple released the Powerbeats Wireless ear-clip headphones under the brand Beats by Dre. Powerbeats Wireless were marketed towards athletes and featured an ear-clip hanger bar (also known as an ear-hook) which provided a secure fit for active use.  Powerbeats Wireless are considered wireless because they do not need to be physically plugged into a device to play music, they are not considered to be "True Wireless" because the two ear-clip headphones were connected to one another by a cable.  On April 3, 2019, Apple introduced Powerbeats Pro under the brand Beats by Dre. Unlike Powerbeats Wireless, Powerbeats Pro are True Wireless ear-clip headphones. Powerbeats Pro feature the Apple H1 Chip, which among other things, enables users the ability to initiate requests to a network server.

63.     On information and belief, before the AirPods and the Powerbeats Wireless and Pro, Apple did not have a commercially available True Wireless headphone product.

## THE PATENTS-IN-SUIT

64.     On February 12, 2019, U.S. Patent No. 10,206,025, entitled "System with Wireless Earphones," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '025 Patent is attached hereto as Exhibit A.

65.     On May 21, 2019, U.S. Patent No. 10,298,451, entitled "Configuring Wireless Devices for a Wireless Infrastructure Network," was duly and legally issued by the United States

Patent and Trademark Office.  A true and accurate copy of the '451 Patent is attached hereto as Exhibit B.

66.     On November 5, 2019, U.S. Patent No. 10,469,934, entitled "System with Wireless Earphones," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '934 Patent is attached hereto as Exhibit C.

67.     On November 26, 2019, U.S. Patent No. 10,491,982, entitled "System with Wireless Earphones," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '982 Patent is attached hereto as Exhibit D.

68.     On December 10, 2019, U.S. Patent No. 10,506,325, entitled "System with Wireless Earphones," was duly and legally issued by the United States Patent and Trademark Office.  A true and accurate copy of the '325 Patent is attached hereto as Exhibit E.

69.     The Patents-in-Suit represent Koss's significant investment into the wireless headphone and wearable technology space, including its commitment in the form of decades of research and millions of dollars.

### APPLE'S KNOWLEDGE OF THE PATENTS-IN-SUIT

70.     On September 7, 2017 Koss informed Apple that it was infringing U.S. Patent No. 9,729,959, a parent of several of the Patents-in-Suit.

71.     Over the following two and a half years, Koss and its representatives met with Apple a total of four times in Apple's California offices and in the course of those meetings, as well as several additional email exchanges, provided Apple with claim charts identifying how Apple infringed certain of Koss's patents, including each of the Patents-in-Suit.

72.     Prior to the filing of the instant Complaint, Koss informed Apple of its belief that Apple was infringing each of the Patents-in-Suit.

73.    Nevertheless, Apple has not taken a license to the Patents-in-Suit.

74.    On information and belief, Apple has not altered the functionality of any of its products to avoid infringement of the Patents-in-Suit.

**FIRST CAUSE OF ACTION**

**(Infringement of the '025 Patent)**

75.    Koss incorporates by reference and realleges each and every allegation of Paragraphs 1 through 74 as if set forth herein.

76.    Koss owns all substantial rights, interest, and title in and to the '025 Patent, including the sole and exclusive right to prosecute this action and enforce the '025 Patent against infringers, and to collect damages for all relevant times.

77.    The '025 Patent generally describes wireless earphones that comprise a transceiver circuit for receiving streaming audio from a data source, such as a digital audio player or a computer, over a wireless network.

78.    The written description of the '025 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

79.    Apple has made, had made, used, imported, supplied, distributed, sold, and/or offered for sale products and/or systems, including systems in which its AirPods and/or wireless Beats by Dre-branded products and/or systems are incorporated ("Accused Headphones").

80.    As set forth in the attached non-limiting Claim chart (Exhibit F), Apple has infringed and is infringing at least Claim 1 of the '025 Patent by making, having made, using,

importing, supplying, distributing, selling, and/or offering for sale the Accused Headphones.  In particular, the use of the Accused Headphones by Apple to, for example, demonstrate those products in brick-and-mortar Apple Stores in Austin, Texas or to, for example, test those products, constitute acts of direct infringement of Claim 1 of the '025 Patent.

81.     Apple actively induces infringement of at least Claim 1 of the '025 Patent by selling the Accused Headphones with instructions as to how to use the Accused Headphones in a system such as that recited in the '025 Patent.  Apple aids, instructs, or otherwise acts with the intent to cause an end user to use the Accused Headphones.  Apple knew of the '025 Patent and knew that its use and sale of the Accused Headphones infringe at least Claim 1 of the '025 Patent.

82.     Apple is also liable for contributory infringement of at least Claim 1 of the '025 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Accused Headphones, used to infringe Claim 1 of the '025 Patent. The Accused Headphones have no substantial non-infringing uses. When an end user uses the Accused Headphones in combination with, for example, an Apple iPhone and/or an Apple Watch, the end user directly infringes Claim 1 of the '025 Patent.  Apple knew that the Accused Headphones were especially made for use in an infringing manner prior to the filing of this lawsuit.  For at least the reasons set forth above, Apple contributes to the infringement of the '025 Patent by others.

83.     Koss has been damaged as a result of the infringing conduct by Apple alleged above.  Thus, Apple is liable to Koss in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

84.     Apple's infringement of the '025 Patent has caused, and will continue to cause, Koss to suffer substantial and irreparable harm.

85.     Apple has been aware that it infringes the '025 Patent since at least March 6, 2019. Upon information and belief, Apple was aware of its infringement of the '025 Patent at least as early as February 12, 2019, when the '025 Patent issued, through Apple's own freedom-to-operate analysis, initiated, in part, due to the communications Apple was having with Koss at that time.

86.     On information and belief, to the extent Apple did not learn of the '025 Patent on or around February 12, 2019, Apple was willfully blind to its infringement of the '025 Patent.

87.     Apple's infringement of the '025 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Koss's rights under the patent.

88.     Koss has complied with 35 U.S.C. § 287 with respect to the '025 Patent.

## SECOND CAUSE OF ACTION

### (Infringement of the '451 Patent)

89.     Koss incorporates by reference and realleges each and every allegation of Paragraphs 1 through 88 as if set forth herein.

90.     Koss owns all substantial rights, interest, and title in and to the '451 Patent, including the sole and exclusive right to prosecute this action and enforce the '451 Patent against infringers, and to collect damages for all relevant times.

91.     The '451 Patent generally describes a credentialed system for accessing an ad hoc communications link between an electronic device, such as a speaker or medical device, and a mobile computing device.

92.     The written description of the '451 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from

and improved upon what may have been considered conventional or generic in the art at the time of the invention.

93.     Apple has made, had made, used, imported, supplied, distributed, sold, or offered for sale products and/or systems, including systems in which its HomePod and/or Apple Watch products and/or systems are incorporated ("Accused Networking Devices").

94.     As set forth in the attached non-limiting Claim chart (Exhibit G), Apple has infringed and is infringing at least Claim 1 of the '451 Patent by making, having made, using, importing, supplying, distributing, selling, and/or offering for sale the Accused Networking Devices.  In particular, the use of the Accused Networking Devices by Apple to, for example, demonstrate those products in brick-and-mortar Apple Stores in Austin, Texas or to, for example, test those products, constitute acts of direct infringement of Claim 1 of the '451 Patent.

95.     Apple actively induces infringement of at least Claim 1 of the '451 Patent by selling the Accused Networking Devices with instructions as to how to use the Accused Networking Devices in a system such as that recited in the '451 Patent.  Apple aids, instructs, or otherwise acts with the intent to cause an end user to use the Accused Networking Devices.  Apple knew of the '451 Patent and knew that its use and sale of the Accused Networking Devices infringe at least Claim 1 of the '451 Patent.

96.     Apple is also liable for contributory infringement of at least Claim 1 of the '451 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Accused Networking Devices, used to infringe Claim 1 of the '451 Patent. The Accused Networking Devices have no substantial non-infringing uses.  When an end user uses the Accused Networking Devices in combination with, for example, an Apple iPhone, the end user directly infringes Claim 1 of the '451 Patent.  Apple knew that the Accused Networking Devices

were especially made for use in an infringing manner prior to the filing of this lawsuit.  For at least the reasons set forth above, Apple contributes to the infringement of the '451 Patent by others.

97.     Koss has been damaged as a result of the infringing conduct by Apple alleged above.  Thus, Apple is liable to Koss in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

98.     Apple's infringement of the '451 Patent has caused, and will continue to cause, Koss to suffer substantial and irreparable harm.

99.     Apple has been aware that it infringes the '451 Patent since at least August 5, 2019. Upon information and belief, Apple was aware of its infringement of the '451 Patent at least as early as May 21, 2019, when the '451 Patent issued, through Apple's own freedom-to-operate analysis, initiated, in part, due to the communications Apple was having with Koss at that time.

100.    On information and belief, to the extent Apple did not learn of the '451 Patent on or around May 21, 2019, Apple was willfully blind to its infringement of the '451 Patent.

101.    Apple's infringement of the '451 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Koss's rights under the patent.

102.    Koss has complied with 35 U.S.C. § 287 with respect to the '451 Patent.

### THIRD CAUSE OF ACTION

### (Infringement of the '934 Patent)

103.    Koss incorporates by reference and realleges each and every allegation of Paragraphs 1 through 102 as if set forth herein.

104. Koss owns all substantial rights, interest, and title in and to the '934 Patent, including the sole and exclusive right to prosecute this action and enforce the '934 Patent against infringers, and to collect damages for all relevant times.

105. The '934 Patent generally describes wireless earphones that comprise a transceiver circuit for receiving streaming audio from a data source, such as a digital audio player or a computer, over a wireless network.

106. The written description of the '934 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

107. Apple has made, had made, used, imported, supplied, distributed, sold, or offered for sale products and/or systems, including systems in which its AirPods and/or wireless Beats by Dre-branded products and/or systems are incorporated ("Accused Headphones").

108. As set forth in the attached non-limiting Claim chart (Exhibit H), Apple has infringed and is infringing at least Claim 1 of the '934 Patent by making, having made, using, importing, supplying, distributing, selling, and/or offering for sale the Accused Headphones.  In particular, the use of the Accused Headphones by Apple to, for example, demonstrate those products in brick-and-mortar Apple Stores in Austin, Texas or to, for example, test those products, constitute acts of direct infringement of Claim 1 of the '934 Patent.

109. Apple actively induces infringement of at least Claim 1 of the '934 Patent by selling the Accused Headphones with instructions as to how to use the Accused Headphones in a system such as that recited in the '934 Patent.  Apple aids, instructs, or otherwise acts with the intent to

cause an end user to use the Accused Headphones.  Apple knew of the '934 Patent and knew that its use and sale of the Accused Headphones infringe at least Claim 1 of the '934 Patent.

110.    Apple is also liable for contributory infringement of at least Claim 1 of the '934 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Accused Headphones, used to infringe Claim 1 of the '934 Patent. The Accused Headphones have no substantial non-infringing uses. When an end user uses the Accused Headphones in combination with, for example, an Apple iPhone and/or an Apple Watch, the end user directly infringes Claim 1 of the '934 Patent.  Apple knew that the Accused Headphones were especially made for use in an infringing manner prior to the filing of this lawsuit.  For at least the reasons set forth above, Apple contributes to the infringement of the '934 Patent by others.

111.    Koss has been damaged as a result of the infringing conduct by Apple alleged above.  Thus, Apple is liable to Koss in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

112.    Apple's infringement of the '934 Patent has caused, and will continue to cause, Koss to suffer substantial and irreparable harm.

113.    Apple has been aware that it infringes the '934 Patent since at least October 30, 2019.  Upon information and belief, Apple was aware of its infringement of the '934 Patent at least as early as November 5, 2019, when the '934 Patent issued, through Apple's own freedom-to-operate analysis, initiated, in part, due to the communications Apple was having with Koss at that time.

114.    On information and belief, to the extent Apple did not learn of the '934 Patent on or around November 5, 2019, Apple was willfully blind to its infringement of the '934 Patent.

115.    Apple's infringement of the '934 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Koss's rights under the patent.

116.    Koss has complied with 35 U.S.C. § 287 with respect to the '934 Patent.

## FOURTH CAUSE OF ACTION

### (Infringement of the '982 Patent)

117.    Koss incorporates by reference and realleges each and every allegation of Paragraphs 1 through 116 as if set forth herein.

118.    Koss owns all substantial rights, interest, and title in and to the '982 Patent, including the sole and exclusive right to prosecute this action and enforce the '982 Patent against infringers, and to collect damages for all relevant times.

119.    The '982 Patent generally describes wireless earphones that comprise a transceiver circuit for receiving streaming audio from a data source, such as a digital audio player or a computer, over a wireless network.

120.    The written description of the '982 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

121.    Apple has made, had made, used, imported, supplied, distributed, sold, or offered for sale products and/or systems, including systems in which its AirPods products and/or systems are incorporated ("Accused AirPods").

122.    As set forth in the attached non-limiting Claim chart (Exhibit I), Apple has infringed and is infringing at least Claim 1 of the '982 Patent by making, having made, using,

importing, supplying, distributing, selling, and/or offering for sale the Accused AirPods.   In particular, the use of the Accused AirPods by Apple to, for example, demonstrate those products in brick-and-mortar Apple Stores in Austin, Texas or to, for example, test those products, constitute acts of direct infringement of Claim 1 of the '982 Patent.

123.    Apple actively induces infringement of at least Claim 1 of the '982 Patent by selling the Accused AirPods with instructions as to how to use the Accused AirPods in a system such as that recited in the '982 Patent.  Apple aids, instructs, or otherwise acts with the intent to cause an end user to use the Accused AirPods.  Apple knew of the '982 Patent and knew that its use and sale of the Accused AirPods infringe at least Claim 1 of the '982 Patent.

124.    Apple is also liable for contributory infringement of at least Claim 1 of the '982 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Accused AirPods, used to infringe Claim 1 of the '982 Patent. The Accused AirPods have no substantial non-infringing uses. When an end user uses the Accused AirPods in combination with, for example, an Apple iPhone and/or an Apple Watch, the end user directly infringes Claim 1 of the '982 Patent.  Apple knew that the Accused AirPods were especially made for use in an infringing manner prior to the filing of this lawsuit.  For at least the reasons set forth above, Apple contributes to the infringement of the '982 Patent by others.

125.    Koss has been damaged as a result of the infringing conduct by Apple alleged above.  Thus, Apple is liable to Koss in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

126.    Apple's infringement of the '982 Patent has caused, and will continue to cause, Koss to suffer substantial and irreparable harm.

127.     Apple has been aware that it infringes the '982 Patent since at least December 6, 2019.  Upon information and belief, Apple was aware of its infringement of the '982 Patent at least as early as November 26, 2019, when the '982 Patent issued, through Apple's own freedom-to-operate analysis, initiated, in part, due to the communications Apple was having with Koss at that time.

128.     On information and belief, to the extent Apple did not learn of the '982 Patent on or around November 26, 2019, Apple was willfully blind to its infringement of the '982 Patent.

129.     Apple's infringement of the '982 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Koss's rights under the patent.

130.     Koss has complied with 35 U.S.C. § 287 with respect to the '982 Patent.

## FIFTH CAUSE OF ACTION

### (Infringement of the '325 Patent)

131.     Koss incorporates by reference and realleges each and every allegation of Paragraphs 1 through 130 as if set forth herein.

132.     Koss owns all substantial rights, interest, and title in and to the '325 Patent, including the sole and exclusive right to prosecute this action and enforce the '325 Patent against infringers, and to collect damages for all relevant times.

133.     The '325 Patent generally describes wireless earphones that comprise a transceiver circuit for receiving streaming audio from a data source, such as a digital audio player or a computer, over a wireless network.

134.     The written description of the '325 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from

503314262 v9

and improved upon what may have been considered conventional or generic in the art at the time of the invention.

135.    Apple has made, had made, used, imported, supplied, distributed, sold, or offered for sale products and/or systems, including systems in which its AirPods products and/or systems are incorporated ("Accused AirPods").

136.    As set forth in the attached non-limiting Claim chart (Exhibit J), Apple has infringed and is infringing at least Claim 1 of the '325 Patent by making, having made, using , importing, supplying, distributing, selling, and/or offering for sale the Accused AirPods.   In particular, the use of the Accused AirPods by Apple to, for example, demonstrate those products in brick-and-mortar Apple Stores in Austin, Texas or to, for example, test those products, constitute acts of direct infringement of Claim 1 of the '325 Patent.

137.    Apple actively induces infringement of at least Claim 1 of the '325 Patent by selling the Accused AirPods with instructions as to how to use the Accused AirPods in a system such as that recited in the '325 Patent.  Apple aids, instructs, or otherwise acts with the intent to cause an end user to use the Accused AirPods.  Apple knew of the '325 Patent and knew that its use and sale of the Accused AirPods infringe at least Claim 1 of the '325 Patent.

138.    Apple is also liable for contributory infringement of at least Claim 1 of the '325 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Accused AirPods, used to infringe Claim 1 of the '325 Patent. The Accused AirPods have no substantial non-infringing uses. When an end user uses the Accused AirPods in combination with, for example, an Apple iPhone and/or an Apple Watch, the end user directly infringes Claim 1 of the '325 Patent.  Apple knew that the Accused AirPods were especially made

for use in an infringing manner prior to the filing of this lawsuit.  For at least the reasons set forth above, Apple contributes to the infringement of the '325 Patent by others.

139.    Koss has been damaged as a result of the infringing conduct by Apple alleged above.  Thus, Apple is liable to Koss in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

140.    Apple's infringement of the '325 Patent has caused, and will continue to cause, Koss to suffer substantial and irreparable harm.

141.    Apple has been aware that it infringes the '325 Patent since at least December 6, 2019.  Upon information and belief, Apple was aware of its infringement of the '325 Patent at least as early as December 10, 2019, when the '325 Patent issued, through Apple's own freedom-to-operate analysis, initiated, in part, due to the communications Apple was having with Koss at that time.

142.    On information and belief, to the extent Apple did not learn of the '325 Patent on or around December 10, 2019, Apple was willfully blind to its infringement of the '325 Patent.

143.    Apple's infringement of the '325 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Koss's rights under the patent.

144.    Koss has complied with 35 U.S.C. § 287 with respect to the '325 Patent.

## JURY DEMAND

Koss hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

WHEREFORE, Koss requests that:

A.      The Court find that Apple has directly infringed the Patents-in-Suit and hold Apple liable for such infringement;

B.      The Court find that Apple has indirectly infringed the Patents-in-Suit by inducing its customers to directly infringe the Patents-in-Suit and hold Apple liable for such infringement;

C.      The Court find that Apple has indirectly infringed the Patents-in-Suit by contributing to Apple's customers' direct infringement of the Patents-in-Suit and hold Apple liable for such infringement;

D.      The Court award damages pursuant to 35 U.S.C. § 284 adequate to compensate Koss for Apple's past infringement of the Patents-in-Suit, including both pre- and post-judgment interest and costs as fixed by the Court;

E.      The Court increase the damages to be awarded to Koss by three times the amount found by the jury or assessed by the Court;

F.      The Court declare that this is an exceptional case entitling Koss to its reasonable attorneys' fees under 35 U.S.C. § 285; and

G.      The Court award such other relief as the Court may deem just and proper.


Dated: July 23, 2020                       Respectfully submitted,

                                            /s/ *Darlene F. Ghavimi*
                                           Darlene F. Ghavimi
                                           Texas State Bar No. 24072114
                                           **K&L GATES LLP**
                                           2801 Via Fortuna, Suite #350
                                           Austin, TX 78746
                                           Tel.: (512) 482-6919
                                           Fax: (512) 482-6859
                                           darlene.ghavimi@klgates.com

503314262 v9

Benjamin E. Weed
(*pro hac vice* to be filed)
Philip A. Kunz
(*pro hac vice* to be filed)
Erik J. Halverson
(*pro hac vice* to be filed)
Gina E. Johnson
(*pro hac vice* to be filed)
**K&L GATES LLP**
Suite 3300
70 W. Madison Street
Chicago, IL 60602
Tel.: (312) 372-1121
Fax: (312) 827-8000
benjamin.weed@klgates.com
philip.kunz@klgates.com
erik.halverson@klgates.com
gina.johnson@klgates.com


Peter E. Soskin
(*pro hac vice* to be filed)
**K&L GATES LLP**
Suite 1200
4 Embarcadero Center
San Francisco, CA 94111
Tel.: (415) 882-8046
Fax: (415) 882-8220
peter.soskin@klgates.com


**ATTORNEYS FOR PLAINTIFF KOSS
CORPORATION**

503314262 v9